IN THE OREGON TAX COURT
MAGISTRATE DIVISION

BLUE CROSS/BLUE SHIELD/
HMO OF OREGON,
*and*

Capital Health Care,
*Plaintiffs,*

*v.*

MARION COUNTY ASSESSOR,
*Defendant,*

*and*

DEPARTMENT OF REVENUE,
*Intervenor-Defendant.*

(TC-MD 981666 (Control))

HMO OREGON/BLUE CROSS/BLUE SHIELD,
*Plaintiff,*

*v.*

MARION COUNTY ASSESSOR,

*and*

DEPARTMENT OF REVENUE,
*Defendants.*

(TC-MD 990869D)

W. Scott Phinney, Lake Oswego, argued the cause for Plaintiffs (Blue Cross).

Joseph A. Laronge, Assistant Attorney General, Department of Justice, Salem, argued the cause for Defendant (the county) and Intervenor-Defendant (the department).

Decision rendered April 2, 2001.

**COYREEN R. WEIDNER, Magistrate.**

Plaintiffs appeal the 1997-98 and 1998-99 real market value of the personal property identified in Account Nos. 1213-000 and 819-500. Trial in the matter was held in the courtroom of the Oregon Tax Court December 12 through 14, 2000. W. Scott Phinney, Attorney at Law, appeared on behalf of Plaintiffs. Joseph A. Laronge, Assistant Attorney General, appeared on behalf of Defendant and Intervenor. For ease of reference herein, Plaintiffs will be referred to as "Blue Cross"; Defendant and Intervenor will be collectively referred to as "the department."

## STATEMENT OF FACTS

Blue Cross occupies two buildings in Marion County. One is a six-story building located in downtown Salem and the other is a single-story building located in the Fairview Industrial Park. Blue Cross is the largest employee benefits company in the State of Oregon. The personal property that is the subject of this appeal is used for "health insurance underwriting, administrative and support services."

### Blue Cross's Appraisal

John C. Kruzinski appraised the subject property for the 1997-98 and 1998-99 tax years and testified in support of his appraisals for Blue Cross during the trial. Kruzinski is a

senior member of the American Society of Appraisers in Portland, Oregon, and specializes in machinery and equipment valuation. In appraising the property, he grouped the personal property into two main categories: (1) technological equipment and (2) office furniture.

*Technological Equipment*

In the technological equipment portion of his appraisal, Kruzinski valued Blue Cross's personal computers, mainframe computer, telephone and fax system, and general office equipment.[1] Items within the general office equipment category include, among other things, typewriters, video projectors, overhead projectors, shredders, and whiteboards.

Kruzinski began his appraisal by using an asset list provided to him by Joyce Kerstiens, the Corporate Tax Specialist for Blue Cross. He looked up each asset in the Orion Blue Book to obtain a used value for either the particular asset or a comparable piece of equipment. Kruzinski testified that used equipment retailers use the Orion Blue Book to set sales prices for used equipment. The Orion Blue Book reflects the national average price a dealer can expect to receive on a particular piece of equipment. When Kruzinski located a particular or comparable asset in the Orion Blue Book, he used the book's used value as the value for the subject asset in his appraisal. He testified that he identified 70 to 80 percent of the subject assets in the Orion Blue Book.

For the assets he was unable to locate in the Orion Blue Book, Kruzinski prepared a depreciation study to apply to them. In the study, Kruzinski divided the current used market value for each asset he found in the Orion Blue Book by the original cost of the asset (paid by Blue Cross) to derive a percent good. He then computed the average percent good for assets based on their age. Kruzinski derived the following percentages:

---

[1] Prior to trial, Blue Cross withdrew its appeal of the value of the personal computers for both tax years. It further accepted the department's appraised value of the computer mainframe equipment and the telephone/fax system for the 1997-98 tax year.

| Year of Acquisition | Percent Good |
| --- | --- |
| 1991 and older | 13% |
| 1992 | 16% |
| 1993 | 16% |
| 1994 | 17% |
| 1995 | 19% |
| 1996 | 21% |
| 1997 | 39% |

He applied those percentages to Blue Cross's cost of the unidentified assets, based on their year of acquisition, to derive a used value for those assets. For the computer mainframe,[2] Kruzinski derived a value for the 1998-99 tax year of $938,003. Adding 10 percent for freight and installation, he arrived at a final value of $1,031,803.[43] For the office equipment, after adding 10 percent for freight and installation, he derived a value of $61,714 for the 1997-98 tax year and a value of $65,176 for the 1998-99 tax year. For the telephone and fax system, again after adding 10 percent for freight and installation, Kruzinski derived a value of $168,214 for the 1998-99 tax year.[5]

*Office Furniture*

Kruzinski placed all of Blue Cross's desks, chairs, file cabinets, cubicles, etc., under the office furniture category and applied the same value approach to all of this furniture. Blue Cross remodeled the first three floors of its downtown facility in 1995, so much of the furniture was only two and three years old as of the appraisal date. In valuing that property, Kruzinski went to the used furniture market. He interviewed several used furniture dealers who commented to him that the used furniture market is experiencing a significant

---

[2] The computer mainframe components are located in two separate accounts. The majority is found in Account No. 1213-000, with the peripheral components located with the rest of the personal property in Account No. 819-500.

[4] This value is allocated between the two accounts as follows: $942,499 to Account No. 1213-000 and $89,304 to Account No. 819-500.

[3] For the computer mainframe, Blue Cross accepted the department's appraised value of $1,248,000 for the 1997-98 tax year.

[5] For the telephone and fax system, Blue Cross accepted the department's appraised value of $277,540 for the 1997-98 tax year.

oversupply. He spoke with Bob Huckaby from 1st Time, Inc., which is a company in the Portland area that sells new furniture and purchases used furniture. It markets the used furniture through its sister company 2nd Time Furniture. Huckaby advised that 1st Time, Inc., had supplied Blue Cross with furniture in the past. He told Kruzinski that, during the relevant tax years, he would have expected to pay Blue Cross 8 percent of Blue Cross's original *cost* for the furniture. Huckaby stated he would then mark the furniture up 100 percent for resale. As evidence of this, he told Kruzinski that he had proposed buying some of Blue Cross's furniture in March 1998, and the quote he provided was 8 percent of Blue Cross's cost. He subsequently purchased the property in October 1998 for 1 percent of cost.

Kruzinski also spoke with an account representative from Smith Brothers, another supplier of Blue Cross. The representative stated that Smith Brothers would generally pay 5 percent of original *cost* for wood furniture, 2 to 4 percent for office system furniture, 2 to 4 percent for chairs, and 3 to 4 percent for storage systems. He also believed a 100 percent mark-up would apply.

In addition, Kruzinski spoke with John Noble, a representative of Network Office Clearing House, a wholesaler of used system furniture in Portland with offices nationwide. He opined that, as a wholesaler, he pays 7 to 8 percent of *list* for the best furniture, with the majority being 1 to 7 percent. He advised that a wholesaler will mark the price up 100 percent to the dealer and the dealer will mark the price up an additional 25 to 35 percent to the end user. He advised that, under the best scenario, dealers will receive 17 to 22 percent of list when selling to the end user; under the worst scenario, dealers will receive between 2 to 6 percent of list.

Based on his discussions with the above representatives, Kruzinski primarily relied upon the opinion of Huckaby and concluded that a 16 percent rate should be applied to the *cost* of Blue Cross's furniture, with 18 percent being applied to its wood furniture. Using those percentages, he arrived at a value of $481,806 for the 1997-98 tax year and $486,294 for the 1998-99 tax year. He added 7 percent for freight and installation for a total recommended value of

$515,532 for the 1997-98 tax year and $520,335 for the 1998-99 tax year.

To summarize, Blue Cross recommends the court accept the following values:

| Asset Type | 1997-98 Value | 1998-99 Value |
| --- | --- | --- |
| Computer Mainframe | $1,248,000[6] | $1,031,803 |
| Office Equipment | $ 61,714 | $ 65,176 |
| Phone/Fax | $ 277,540[7] | $ 168,214 |
| Office Furniture | $ 515,532 | $ 520,335 |

## *The Department's Appraisal*

The department prepared an appraisal for the 1997-98 tax year. It separated the property into four categories: (1) computer mainframe, (2) telephone and fax system, (3) case goods, and (4) system furniture (cubicles).[8] The department assigned several appraisers to the project of conducting a physical inventory of the assets at both locations. Different appraisers handled different portions of the appraisal.

### *Computer Mainframe*

Keith Bowman, a Senior Industrial Appraiser and Data Analyst for the department, prepared the appraisal for the computer mainframe equipment. He utilized an asset list provided to him by Blue Cross as the starting point for his appraisal. He had attempted to base the appraisal on the physical inventory but soon realized that many of the inventoried assets had been acquired subsequent to the appraisal dates. Upon reviewing Blue Cross's asset list, Bowman testified that he is satisfied it is a complete listing.

To value the computer mainframe equipment, Bowman prepared a depreciation study. The source used in

---

[6] Reflects the value in the department's appraisal that Blue Cross accepted.

[7] Reflects the value in the department's appraisal that Blue Cross accepted.

[8] The appraisal also included a category for personal computers and noninventory supplies. Because Blue Cross withdrew its appeal as to the personal computers, and noninventory supplies are not at issue, the court will not address those portions of the department's appraisal.

that study was the on-line version of the Orion Blue Book. He searched used sales prices based on the age of an asset. For example, he typed in a query of "1993 personal computer" and the Orion Blue Book provided a list of various 1993 personal computers that had recently been sold. Bowman testified he randomly selected several of the sales to include in his study. For computers introduced in 1993, for instance, he selected 12 sales; for computers introduced in 1994, he selected 9 sales; for computers introduced in 1995, he selected 15 sales; for computers introduced in 1996, he selected 10 sales; and for computers introduced in 1997, he selected 3 sales.

Bowman listed each computer he selected for the study and noted the 1997 retail used value and the cost new value. He obtained both figures from the Orion Blue Book. He then divided the used value by the new value to derive a depreciation percentage. Then he used the various percentages to calculate a mean and median percent good for a particular year.[9] He arrived at the following percent good depreciation percentages:

| Age of Computer | Mean | Median |
|---|---|---|
| Four years old | 17% | 17% |
| Three years old | 27% | 28% |
| Two years old | 35% | 32% |
| One year old | 44% | 44% |

Based on his analysis, Bowman determined the median was the best depreciation indicator to use in his appraisal. He then applied the appropriate depreciation percentage (based on age) to the *cost* of Blue Cross's mainframe computer components to derive a value. After performing the calculations, he arrived at a real market value for the 1997-98 tax year of $1,248,000. He testified that his opinion of value did not change for the 1998-99 tax year.

---

[9] Bowman testified that, in determining the data to be used to calculate the mean and median percent good, he decided to use two years of sales for each age group of an asset because the tax year runs from July 1 to June 30. For example, for assets four years old, he used sales of assets introduced in both 1993 and 1994 to calculate the average percent good. For assets three years old, he used sales of assets introduced in both 1994 and 1995 to calculate the average percent good. He applied the same pattern for assets two years old and one year old.

*Telephone and Fax System*

Robert Steiner, an Appraiser with the Multnomah County Assessor's Office, prepared the appraisal for the telephone and fax system for the department.

*Telephone System*

Steiner talked to various vendors regarding the value of the subject telephone system. He found that most vendors were reluctant to provide any hard data because telephone systems are customer specific. Based on his market research, Steiner concluded that the best method for valuing the telephone system was to determine what it would cost to install a system with the same features and capacity as the subject system. He contacted Telpro and Supply Technologies regarding the price of the equipment and the cost for installation. He was advised that 35 to 40 percent of the cost of a similarly installed new system would be an appropriate percentage to apply to determine the value of the used system. He then determined that, for the downtown office, the estimated cost of a replacement telephone system would be $520,000. Multiplying that cost by 35 percent results in a value of $182,000. To that he added $67,360, representing the value for cable and installation, for a total value for the downtown building of $249,360.[10] Using a similar methodology, he arrived at a value of $16,010 for the Fairview building. Adding the two values together, Steiner arrived at a real market value for the telephone system of $265,370 for the 1997-98 tax year. Although the department presented no specific evidence for the 1998-99 tax year, Steiner testified the value did not change for the 1998-99 tax year.

*Fax Machines*

To value the fax machines, Steiner consulted the Asay Blue Book. He looked up each piece of equipment in the Asay Blue Book to gather a cost used for the equipment. Adding the values together, he arrived at a 1997-98 value of $12,170 for the fax machines.[11] Although the department

---

[10] The labor cost was based on 1,180 hours at $75 per hour. The cable cost was based on 27 cents per foot with 140,000 feet of cable. Steiner depreciated the cost using a 15-year life with eight years remaining.

[11] The department's Exhibit A at page 283 shows an Asay Blue Book value of $12,717. The numbers are apparently transposed because adding the values

presented no specific evidence for the 1998-99 tax year, Steiner testified the value did not change for the 1998-99 tax year.

*Case Goods*

Under the case goods category, the department valued all the furniture except cubicles. The category includes "stand-alone single or double pedestal desks, credenzas, bookcases, letter and lateral file cabinets, storage cabinets and chairs such as executive, posture, steno or side, and all other general office equipment." Items like overhead projectors and whiteboards, which were specifically set out as "office equipment" in Blue Cross's appraisal, are contained within the department's general case goods description.

Roger Clymore prepared the appraisal of the case goods for the department. He is a Senior Appraisal Analyst with the department and is responsible for putting together guidelines for counties to use when mass appraising personal property. To appraise the case goods, he used Blue Cross's asset list as of July 1, 1997. He used the consumer price index to index the original cost of the assets to a cost new as of 1997. He arrived at an indexed cost new to Blue Cross of $2,065,964. Based on his discussions with Smith Brothers, Clymore determined that Blue Cross generally received a 63 percent discount off the list price for its purchases. Because the indexed cost new to Blue Cross allowed for this discount, he attempted to convert the figure to reflect a current *list* price for the property. In doing so, he divided the indexed cost new by .63 to arrive at a list price of $3,279,308.[12] In discussing the used furniture market with Mike Smith, President of RTR Services, Inc., a remarketer of commercial equipment in the Salem area, Smith indicated to him that a dealer expects to pay about 10 percent on the dollar for used goods. Therefore, he multiplied the list price of $3,279,308 by 10 percent to arrive at a value of $327,930. Smith further advised that a dealer will increase the price paid by 400 to 500 percent. As a

together leads to a total value of $12,171. This is confirmed by the department's recommended value conclusion of $12,170 on page 32 of Exhibit A.

[12] Dividing $2,065,964 by .63 leads to a current list price of $3,279,308. The department's exhibit initially sets forth a current list price of $3,278,308. In the next step of its analysis, the department uses the correct figure of $3,279,308.

result, Clymore increased the value by a factor of four to arrive at an indicated value for the subject case goods of $1,311,723.

At trial, Clymore testified that he made a calculation error when attempting to convert the indexed cost of Blue Cross's furniture to a list price. Instead of dividing the indexed cost by .63, he should have divided it by .37 to reflect the 63 percent discount Blue Cross generally receives on its purchases. Applying the correct calculation leads to a list price of $5,583,686.[13] Multiplying that figure by 10 percent, then increasing it by a factor of 4, leads to an indicated value for the case goods of $2,233,474.[14] That indicated value is greater than the indexed cost new to Blue Cross. Clymore testified that performing the correct calculation leads to an inflated value. He believes that, had he divided the indexed cost by .37 initially, he would have realized the information provided to him by Smith was not reliable.[15]

Notwithstanding the errors, Clymore concluded that his original value conclusion of $1,311,723 as of July 1, 1997, is a solid number based on his discussions with various other used furniture dealers. The department presented no specific evidence or testimony for the 1998-99 tax year.

*Cubicles*

Clymore was also responsible for valuing Blue Cross's system furniture (cubicles). He and a team of appraisers reviewed schematic diagrams provided to them by Blue Cross. They then visited the locations and inventoried the panels on each floor, noting the various sizes. After visiting the property, he knew the number of cubicles that were on each floor. In valuing the cubicles, Clymore utilized two approaches. The first he termed a "build up method."

---

[13] The department's Exhibit D, which demonstrates the correct calculation, shows a resulting figure of $5,580,686. The court's calculation leads to a figure of $5,583,686.

[14] Blue Cross's Exhibit 10 shows a value conclusion of $2,232,280. It arrived at this value, however, by using the department's proffered list price of $5,580,686.

[15] At trial, Smith testified he would pay 10 percent of "advertised" price, which is something different than list price.

Under the build up method, Clymore looked at each floor in the downtown building and determined what a typical cubicle consisted of on that floor. He did the same for the Fairview office. He then matched each component of the cubicle with a list price. He obtained the list prices for the various components from Jack Hewitt, who is the President of Network Office Clearinghouse. He added the list prices for the various components to arrive at a total list price for a typical cubicle on that floor. He continued by multiplying that total by the number of cubicles he observed on his inspection to get a total list price for the cubicles on that floor. He then added the totals for each floor, with the total from the Fairview office, to arrive at a total manufacturer's list price for the cubicles of $3,692,475.[16]

Based on his discussions with various dealers and wholesalers in used system furniture, Clymore determined that a wholesaler generally pays 6 percent of *list* for used cubicles. He further concluded that the wholesaler generally marks the price up 25 percent when selling to a dealer, and the dealer marks the price up another 15 percent when selling to an end user. Based on those conclusions, Clymore took the total list price of $3,692,475 and multiplied it by .06 to derive a price paid by a wholesaler of $221,549. He then divided this total by .75 to arrive at a price paid by a dealer of $295,398. He divided that total by .85 to arrive at a price paid by the end user of $347,527. He determined that the cost for furniture installation, electrical installation, and cable installation should also be added to the total. The furniture installation cost of $87,570 was based on six hours of labor per cubicle (417) at $35/hour. The electrical installation cost of $45,000 (rounded) was based on 1½ hours per cubicle at

---

[16] The following is a breakdown by floor of the prices that Clymore used:

| Description | Number of Stations | List Price | Total |
|---|---|---|---|
| 1st Floor | 32 | $ 8,278 | $ 264,896 |
| 2nd Floor | 57 | $ 9,123 | $ 520,011 |
| 3rd Floor | 73 | $ 8,931 | $ 651,963 |
| 4th Floor | 111 | $ 8,343 | $ 926,073 |
| 5th Floor A | 78 | $ 8,912 | $ 695,136 |
| 5th Floor B | 26 | $11,511 | $ 299,286 |
| 6th Floor | 20 | $ 8,825 | $ 176,500 |
| Fairview | 20 | - - - | $ 158,610 |
| | 417 | | $3,692,475 |

$75/hour. The cable installation cost was based on Blue Cross's actual cost of $89,359. In Blue Cross's asset listing was an item entitled "landscaping." Clymore, as well as Kruzinski, assumed landscaping was the outlay for the architectural design for the layout of the cubicles. The asset list sets forth landscaping as having a cost of $417,474; Clymore added that value to his total to arrive at a total cost of $986,930.[17] He then determined that a deduction for depreciation of $67,580[18] should be taken, which results in a total value for the cubicles of $919,350.[19]

The second method used by the department is based on the opinions and testimony of Hewitt. Hewitt testified that an end user would pay a flat percentage of 24 to 26 percent of list price for used cubicles. Applying 25 percent to the list price of the furniture of $3,692,475 results in an indicated value of $923,118. This approach was used as a check on the department's build-up method. The department presented no specific evidence or testimony for the 1998-99 tax year.

To summarize, the department recommends the court accept the following values:

| Asset Type | 1997-98 Value | 1998-99 Value |
|---|---|---|
| Computer Mainframe | $1,248,000 | $1,248,000 |
| Office Equipment | (included with | case goods) |
| Phone/Fax | $ 277,540 | $ 277,540 |
| Case Goods | $1,311,700 | $1,311,700 |
| Cubicles | $ 919,350[20] | $ 919,350 |

---

[17] The department's exhibit shows a total cost of $963,397. Clymore admitted making some mathematical errors in his analysis. Adding the furniture installation cost of $87,570, electrical installation cost of $45,000, landscaping cost of $417,474, and cable installation cost of $89,359 to the cost to consumer of $347,527 leads to an end cost of $986,930.

[18] Clymore depreciated the costs for installation, electrical, and cabling over a 30-year life with 28 years remaining. He depreciated the cost for landscaping over a 15-year life with 13 years remaining.

[19] The department's appraisal shows a value conclusion of $917,349. That value includes the mathematical error mentioned earlier. Further, the department made an additional mathematical error when it subtracted the depreciation of $67,580 from its original computed cost of $963,397. Performing that calculation leads to a depreciated cost of $895,817, rather than the $917,349 reflected in the appraisal.

[20] Reflects value corrected for mathematical errors.

## ANALYSIS

All the appraisers agreed that appraising the subject property was a difficult task. In appraising the property, assumptions and compromises were made and appraisal judgment was exercised. The court's job of deriving a real market value conclusion from the evidence submitted is an equally difficult task. Neither appraisal is without weaknesses and, further complicating the task, the appraisals categorized the property differently. That being said, the court recognizes that both appraisals involved a great amount of time and effort by the various appraisers.

### Technological Equipment

As stated above, Blue Cross's appraisal involves two main categories: technological equipment and office furniture. The approach used under the technological portion of the appraisal is applied to the computer mainframe equipment, telephone and fax system, and office equipment. During trial, the department attacked Blue Cross's method of deriving a percent good to apply to the technological equipment it was unable to identify in the Orion Blue Book. As explained in the facts, Blue Cross divided a used value for an asset it found in the Orion Blue Book by the cost to Blue Cross to derive a percent good. It determined an average percent good for an asset age group and, for the assets the appraiser was unable to locate in the Orion Blue Book, applied the percentage to each unidentified asset's original *cost.*

■ The department argues that using cost in the analysis is a flawed approach because the cost of an asset varies based on the amount of discount received upon purchase. The court disagrees. Kruzinski derived the percentages by dividing the used price by Blue Cross's cost. Because cost formed the basis of the calculation, it is internally consistent to then apply the percent to the assets' costs. Although the percentages derived may not apply to other companies, they work for Blue Cross because, overall, they reflect the difference between cost and used sale price. In addition, little testimony was offered as to discounts received on technological equipment. The court was left with the impression that discounts

are far more prevalent in the furniture industry than technological industry.

The department also criticized Blue Cross's depreciation study because it included every one of the assets it could locate in the Orion Blue Book as part of its study. For instance, if a particular asset was found in the Orion Blue Book and Blue Cross owned 10 of those assets, its percent good was used 10 times in the study. The department claimed that weighting the assets leads to an unreliable depreciation indicator. The court agrees that weighting the assets is not the best approach to deriving an overall percent good. However, it is important to remember that Kruzinski actually identified almost 80 percent of the assets in the Orion Blue Book and was able to apply an Orion Blue Book value to those assets. The study was applied to only 20 to 25 percent of the assets. Although the 20 to 25 percent may reflect a higher percentage of value, as noted by the department, the fact remains that a significant portion of Blue Cross's assets were used in the depreciation study. This large number increases the reliability of the percentages derived by Kruzinski.

*Computer Mainframe Equipment*

■    When comparing the value approaches used for the computer mainframe equipment, the court concludes Blue Cross's approach provides the better indicator of value. Although the department criticized Blue Cross's appraisal for using cost in its analysis, Bowman, the department's appraiser, likewise applied his percentages to Blue Cross's cost. The difference is that Bowman derived his percentages by dividing the used value of an asset by its *list* price. That method becomes flawed when the percentages are applied to the *cost* of Blue Cross's assets. It is inconsistent to use a percent that reflects the difference between used value and *list* price and apply it to *cost*. As pointed out several times by the parties, the cost of an asset does not necessarily equate with the list price of an asset.

Regarding the concerns about weighting of assets, the court notes that, in his study, Bowman chose several of the same assets more than once. As a result, there was a degree of weighting involved in his study as well. Furthermore, Blue Cross used actual equipment owned by it as the

basis for its study. The department used general equipment, which Blue Cross may or may not own, as the basis for its study. That approach may be useful in deriving a percentage to use in a mass appraisal but is not as persuasive when valuing a particular company's assets.

Finally, the department did not explain why it chose a different number of assets for each year in its study. For 1993, Bowman used 12 assets; for 1994, he used 9 assets; for 1995, he used 15 assets; for 1996, he used 10 assets; and for 1997, he used 3 assets. Although perhaps not significant, it does cause the court to further question the method used. As a result, the court concludes that Blue Cross's appraisal of the computer mainframe equipment provides the best indicator of value. The real market value of the computer mainframe equipment for the 1997-98 tax year was $1,248,000[21] and for the 1998-99 tax year it was $1,031,803.[22]

*Telephone / Fax System*

For the telephone and fax system, Blue Cross used the same appraisal approach to value as it did for the computer mainframe equipment. Therefore, the department's criticisms outlined above apply similarly to the telephone and fax system. In comparing the department's approach and Blue Cross's approach, the court finds the department's approach is the best indicator of value. Kruzinski testified that the Orion Blue Book does not include telephone equipment. Therefore, Blue Cross's depreciation study was applied to all of its telephone equipment. The percentages used by Blue Cross were primarily derived from computer equipment. Although Kruzinski testified telephone equipment depreciates at a similar rate, Steiner disagreed and, given the nature of the technology, the court agrees computer equipment depreciates faster than telephone systems. Therefore, the percentages applied to the telephone equipment by Blue Cross are likely to be low.

---

[21] That figure reflects the value derived by the department that was accepted by Blue Cross prior to trial. A breakdown between the accounts was not provided.

[22] The value for 1998-99 shall be broken down as follows:

| | |
|---|---|
| Account No. 1213-000 | $942,499 |
| Account No. 819-500 | $ 89,304 |

The department went to the market to determine what it would cost to replace the telephone system with a comparable one. The information relied upon by Steiner seems reliable and his analysis and reasoning sound. Regarding the fax machine equipment, Steiner found each piece of equipment in the Asay Price Guide and used the price provided in the guide. Balancing the two approaches used by the parties, the court finds the department's approach is the most persuasive evidence of the real market value of the property.

Prior to trial, Blue Cross accepted the department's value conclusion for the telephone and fax equipment for the 1997-98 tax year of $277,540. Because the department did not prepare a specific appraisal for the 1998-99 tax year, Blue Cross claims its opinion is the better evidence. The court disagrees. The appraisal date for the 1997-98 tax year was July 1, 1997; the appraisal date for the 1998-99 tax year was January 1, 1998. Six months separated the appraisal dates. The evidence presented demonstrates that no significant changes to the equipment were made during that time period nor was there a significant change in the market.[23] As a result, the court finds the department's evidence and value conclusions for the 1997-98 tax year may be reliably applied to the 1998-99 tax year. Therefore, the real market value of the telephone and fax system for the 1998-99 tax year was $277,540.

*Office Equipment*

The final classification in the technological equipment category that Blue Cross applied its study to is "office equipment." As mentioned above, the department included that type of equipment in its valuation of Blue Cross's case goods. For the reasons discussed below, the court finds Blue Cross's approach to value for the office equipment to be the best indicator of value. Therefore, the value of the office equipment for the 1997-98 tax year was $61,714 and for the 1998-99 tax year it was $65,176.

---

[23] The court's finding is further evidenced in Blue Cross's appraisal where the value *increased* from $164,865 for the 1997-98 tax year to $168,214 for the 1998-99 tax year.

*Office Furniture*

As outlined above, Blue Cross applied the same value approach to all of its office furniture. After interviewing several used furniture dealers and wholesalers, Kruzinski primarily relied upon the opinions of Huckaby from 1st Time, Inc. He advised Kruzinski that an end user will typically pay 16 percent of the *cost* of Blue Cross's furniture (18 percent for wood). Huckaby also noted that some furniture will command more, while other furniture will command less. He felt that a blended rate of 16/18 percent could be applied to the cost of all the furniture.

■ The most troubling feature to the court about that approach is its reliance on cost. The market is generally unaware of what a company paid for an asset; therefore, to apply a general market percentage to cost suggests a flawed approach. The dealers Clymore spoke with indicated the suggested manufacturer's list price is used as the basis for determining the asking price because original cost is rarely known. Further, to apply the percentage to cost does not account for the large discounts that bigger corporations receive when making purchases. Applying 16 percent to the cost of Blue Cross's furniture likely results in a lower value than when applied to the cost of the same furniture in a small office.

Kruzinski testified that Huckaby was familiar with Blue Cross's costs and, as a result, he felt comfortable accepting the 16 percent of cost approach. It was not made clear to the court whether Huckaby believed the 16 percent of cost applied *only* to Blue Cross or was a general percentage to be applied to other companies.

Furthermore, in the appraisal, Kruzinski generally applied the 16 percent to the original cost of an asset. However, for several items, he indexed the original cost to derive an adjusted cost new, and he applied the 16 percent to this adjusted figure. It was not explained how he decided when to apply the 16 percent to original cost and when to apply the percent to an indexed cost new.

The department grouped the furniture into two categories: case goods and cubicles.

## Case Goods

The department's appraisal, however, is likewise not without its problems. The case goods portion of the department's appraisal essentially broke down during testimony. Both the mathematical errors and a misunderstanding of Smith's opinions led to the approach being invalid in several respects. Notwithstanding the errors, Clymore testified the value he arrived at was sound given his discussions with other furniture dealers. The court, however, cannot accept the department's valuation approach to the case goods. When looking at its approach on page 25 of Exhibit A, the mathematical steps are specifically set forth and the process outlined for how the department arrived at its opinion of value of $1,311,723. When testifying, Clymore agreed the numbers used and steps taken were in error. Yet he stood by the resulting value of $1,311,723. The court cannot accept that value conclusion when it has no supporting basis. Therefore, although weak, Blue Cross's valuation method shall be applied to the items categorized as case goods by the department.[24]

## Cubicles

The department's appraisal of the cubicles likewise contains errors. As mentioned, the department primarily relied on its "build up" method for valuing the cubicles. After determining the price used for the cubicles, Clymore added a depreciated value for electrical, cabling, and installation. He also added $417,474 for an item designated "landscaping" in the asset list. Again, both he and Kruzinski assumed that line item represented the outlay for the architectural design of the cubicles. He then depreciated landscaping over a 15-year life with 13 years remaining. Consequently, of the total value conclusion for the cubicles, $361,811 represents the value for landscaping.[25]

---

[24] Items in the case goods category that were appraised as "office equipment" by Blue Cross should not be valued using this method because the court has already assigned a value to that equipment.

[25] That figure is calculated by subtracting two years' worth of depreciation, $55,663, from the overall cost for the landscaping of $417,474. Clymore calculated the depreciation using the straight-line method. Therefore, two years' depreciation is calculated as follows: ($417,474 ÷ 15) x 2.

On rebuttal, Blue Cross called Joyce Kerstiens as a witness. She is the Corporate Tax Specialist for Blue Cross and oversees its tax reporting. She testified that the item designated in the asset list as landscaping does **not** represent the cost for the architectural design. Instead, she testified it represents a lump sum for the cubicles Blue Cross purchased as part of its remodel in 1995. Rather than individually listing all the furniture purchased, Blue Cross chose to instead make a general ledger entry as "landscaping" to cover this acquisition. That general entry is reflected in the asset list.

No other evidence, testimony, or explanation was provided for the landscaping designation. Therefore, the court must accept Kerstiens' explanation. As a result, under the department's build up method, it should not have added in the $361,811 for landscaping because it really represents the cost for the cubicles, for which the build up method had already accounted. The value conclusion of $919,350 needs to be reduced by $361,811 to reflect the mistaken assumption.

Another error present in the appraisal is that the department included more panels in its "typical cubicle" approach than are listed in the inventory list prepared by the department. When adding the number of panels included in its value approach, the department valued 3,350 panels.[26] Reviewing the department's asset inventory, it listed only 2,085 panels.[27] The department provided no explanation for

[26]

| Floor | Panels in Typical Cubicle | No. of Cubicles | No. of Panels |
|---|---|---|---|
| 1 | 6 | 32 | 192 |
| 2 | 8 | 57 | 456 |
| 3 | 8 | 73 | 584 |
| 4 | 8 | 111 | 888 |
| 5A | 8 | 78 | 624 |
| 5B | 10 | 26 | 260 |
| 6 | 8 | 20 | 160 |
| Fairview | - - | - - - | 186 |
| | | | 3,350 |

[27]

| Floor | No. of Panels |
|---|---|
| 1 | 148 |
| 2 | 272 |
| 3 | 434 |
| 4 | 279 |
| 5 | 501 |
| 6 | 135 |
| Fairview | 316 |
| | 2,085 |

this inconsistency. The court assumes, therefore, that the department failed to account for the sharing of panels that occurs when cubicles are placed alongside one another. Gary O'Dell, head of the maintenance department at Blue Cross, testified that Blue Cross organizes its cubicles in a "six-pack" or "eight-pack" layout. Using that layout allows the cubicles to share panels and maximize space.

After reviewing and weighing the evidence presented regarding the cubicles, the court was most impressed with the testimony of Hewitt. He testified that an end user will normally expect to pay 24 to 26 percent of list. He knowledgeably testified about the market and is involved daily with the resale of used cubicle furniture. Although, as pointed out by Blue Cross, he is involved at only the wholesale level, Hewitt testified that he works closely with dealers and is aware of their mark-up to end users. Further, the court is persuaded that using list price as the starting point for valuing used cubicles is better than starting with cost, which is where Blue Cross began its analysis.

In the department's appraisal, it applied the percentages recommended by Hewitt to a list price of $3,692,475, which is the price arrived at in its build up method. As pointed out above, that list price is inflated because the number of panels used in the calculation is overstated by 62 percent.[28] To remedy the error, the court finds it appropriate to reduce the list price for the panels by 38 percent. That reduction approximately reflects the reduction required from overstating the number of panels. The total list price of the panels used by the department was $1,637,101.[29]

---

[28] $2,085 \div 3,350 = 62.24\%$

[29] The court arrived at that number by figuring the overall list price of the panels of a typical cubicle, as determined by the department, for each floor. It then multiplied the price of the panels by the number of cubicles on that floor for the total list price of all panels on that floor. Then, it added the total list price of the panels on each floor together for an overall list price for the panels. For example, the list price for the first floor's panels was determined as follows:

4 panels at $556 each =   $2,224
1 panel at $386 =         $ 386
1 panel at $415 =         $ 415
Total list price of panels
per cubicle               $3,025
                          x   32 cubicles on that floor
                          $96,800 list price for the panels on the first floor

Reducing it 38 percent leads to a list price for the panels of $1,015,003, for a difference of $622,098. Therefore, the total list price of $3,692,475 arrived at by the department should be reduced by $622,098. That results in a list price for the cubicles of $3,070,377. Multiplying that figure by 24 percent, as recommended by Hewitt, leads to a value conclusion of $736,890.

As already mentioned, the "percent of list" method was the second valuation method relied upon by the department. The first method was its build up method. The problems with the build up method were that the list price overstated the number of panels and the value included a value for landscaping, effectively valuing much of the furniture twice. To remedy the errors, the court can replace its new list price total of $3,070,377, which corrects the overstatement of panels, into the chart. Then, it can eliminate the depreciated value added for landscaping of $361,811. Correcting for those and the mathematical errors leads to a total value of $471,954.[30]

Comparing the revised figure under method one of $471,954 with the revised figure under method two of $736,890 shows a value disparity of approximately $250,000. The question is whether the court believes the approach used by Blue Cross was better than the approaches used by the department. In this situation, the court finds that the department's approaches and methodology are sufficiently reliable to use in reaching a value conclusion and are more persuasive than the approach used by Blue Cross (as compared to

---

[30]

| Total list price of cubicles | $3,070,377 |
|---|---|
| Cost to Wholesaler (x.06) | $ 184,223 |
| Cost to Retailer | $ 230,278 |
| Cost to Consumer (x1.15) | $ 264,820 |
| Installation | $ 87,570 |
| Electrical | $ 45,000 |
| Cable | $ 89,359 |
| | $ 486,749 |
| Less depreciation | $ 14,795 |
| | $ 471,954 |

Depreciation was calculated as follows:
($87,570 + $45,000 + $89,359) x 2 =     $   14,795
           30

the case goods approach where the court was unable to rely with any degree of confidence on the department's approach).

Looking at the values arrived at by the department under both methods, the court finds that the value lies somewhere in between. The court concludes that a value of $600,000 is reasonable for the cubicles for the 1997-98 and 1998-99 tax years.

## CONCLUSION

After weighing the appraisals of both parties and evaluating the approaches used therein, the court is persuaded that neither appraisal is without its weaknesses. Therefore, the court has evaluated each component separately and compared the appraisals to determine which appraisal best represents the value for that component. The "office furniture" category used by Blue Cross was problematic for the court because the department separated those items between case goods and cubicles. The court accepts Blue Cross's approach for the items designated as case goods but rejects its approach for the cubicles. Because Blue Cross provided an overall value for the two, the court is unable to specify an exact dollar amount for the case goods. The court leaves it to the parties to apply the 16/18 percent methodology to the items designated as case goods to arrive at a value for this category of assets.[31] Now, therefore;

IT IS THE DECISION OF THIS COURT THAT:

(1) The real market value of the computer mainframe equipment for the 1997-98 tax year was $1,248,000 and for the 1998-99 tax year was $1,031,803;

(2) The real market value of the telephone and fax equipment for both the 1997-98 and 1998-99 tax years was $277,540;

(3) The real market value of the office equipment for the 1997-98 tax year was $61,714 and for the 1998-99 tax year was $65,176;

---

[31] Items in the case goods category that were appraised as "office equipment" by Blue Cross shall not be valued using that method because the court has already assigned a value to that equipment.

(4)   The real market value for the items designated as case goods in the department's appraisal (minus "office equipment" as designated by Blue Cross) shall be valued for both the 1997-98 and 1998-99 tax years using Blue Cross's valuation method of 16/18 percent of cost;

(5)   The real market value of the cubicle furniture for both the 1997-98 and 1998-99 tax years was $600,000; and

(6)   Blue Cross's appeal of the personal computer equipment is withdrawn and the roll value is hereby sustained.